# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| MIDAS INTERNATIONAL CORPORATION and MIDAS REALTY CORPORATION, | ) ) ) ) | |
| Plaintiffs/ Counter-Defendants, | ) ) ) | |
| v. | ) ) | |
| CRAIG CHESLEY and CHESLEYCO, INC., | ) ) ) | Case No. 11-cv-8933 |
| Defendants/ Counter-Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| MIDAS PROPERTIES, INC., | ) ) | |
| Additional Counter-Defendant. | ) ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiffs Midas International Corporation ("Midas International") and Midas Realty Corporation ("Midas Realty") filed a Complaint against Defendants Craig Chesley and ChesleyCo, Inc. ("ChesleyCo" and collectively with Craig Chesley, "Chesley"), alleging claims for breach of contract and various claims under the Lanham Act, including trademark infringement, unfair competition, and trademark dilution, arising out of their former franchise relationship. Midas International and Midas Realty have also moved for a preliminary injunction. Chesley has answered the Complaint and has also filed Verified Counterclaims against Midas International, Midas Realty, and Midas Properties, Inc. ("Midas Properties" and

collectively with Midas International and Midas Realty, "Midas") for breach of contract, conversion, and treble damages under New York law. Midas now moves to dismiss a portion of Chesley's counterclaims. For the reasons set forth below, the Court denies Midas's motion, but stays Chesley's bad faith contract termination counterclaim.

**BACKGROUND**

Chesley asserts the following counterclaims against Midas: (1) multiple breaches of contract based on Midas's failure to supply competitive product pricing, the "lack of support" from Midas, and Midas's bad faith contract terminations; (2) conversion; and (3) treble damages under Section 853 of the New York Real Property and Proceedings Law ("RPAPL"). Chesley asserts all three of its breach of contract allegations, which are based on different theories, under one counterclaim for "multiple breaches of contract." (R. 44, Countercl. at 35.) Midas moves to dismiss the RPAPL claim and the portion of the breach of contract claim that Chesley bases on Midas's alleged bad faith contract terminations. In support of its claims, Chesley alleges the following facts, which the Court accepts as true for purposes of Midas's motion. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011).

**I.     Allegations Regarding Chesley's Breach of Contract Counterclaim**

Midas International, Midas Realty, and Midas Properties are Delaware corporations that have their principal places of business in Itasca, Illinois. (Countercl. ¶¶ 1-2; R. 44, Answer ¶¶ 3-4.) ChesleyCo, a Midas franchisee, is a New York corporation with its principal place of business in New York. (Answer ¶¶ 4-5.) Craig Chesley is the President of ChesleyCo. (*Id.* ¶ 5.) Chesley and Midas were parties to a total of ten franchise agreements (the "Franchise Agreements") regarding Chesley's operation of ten different "Midas Shops." (Countercl. ¶ 4.)

Midas terminated each of the Franchise Agreements on various dates between November 7, 2011 and February 21, 2012. (*Id.*)

Pursuant to the Franchise Agreements, Midas has substantial control over its franchisees' wholesale purchases of automotive parts and accessories. (*Id.* ¶ 7.) Midas also has substantial discretion to set the prices for the automotive parts and accessories that it sells to franchisees and to approve or disapprove of other potential suppliers of such parts. (*Id.* ¶¶ 8-9.) When Chesley entered into the Franchise Agreements, it expected that Midas would allow it to purchase automotive parts and accessories at prices that would be low enough to give it a competitive advantage in the retail marketplace. (*Id.* ¶ 11.) Chesley based its expectation in part on a "historical bargain" that Midas made with its United States and Canadian franchisees in or around 1980. (*Id.*) In particular, Midas persuaded its franchisees to accept a royalty of 10%, which is high by industry standards. (*Id.* ¶¶ 11-13.) In exchange, Midas agreed to provide lower pricing for automotive parts and accessories so as to give Midas franchisees a competitive edge in the marketplace, even after paying the higher royalties. (*Id.* ¶ 11.) Midas informed Chesley of this "historical bargain when it became a Midas franchisee, and Chesley acquired his Midas franchisees in reliance on it." (*Id.* ¶¶ 12-13.)

In recent years, Midas "exited the business of" supplying its franchisees with automotive parts and accessories and abandoned its previous commitment to provide its franchisees with favorable wholesale pricing on parts and accessories. (*Id.* ¶¶ 14-15.) Midas, however, maintained a 10% royalty. (*Id.* ¶ 15.) Additionally, Midas restricted the pool of suppliers from whom a franchisee could purchase parts and accessories, and it rejected Chesley's demands to approve new suppliers. (*Id.*) Midas also failed to support Chesley's Midas Shops with

3

advertising, promotions, and other programs and support. (*Id.* ¶ 18.)

Midas's failure to supply automotive parts and accessories at competitive prices, combined with its failure to provide adequate advertising for Chesley's Midas Shops, has destroyed the value of Midas's franchises and weakened Chesley's financial condition such that it was not able to comply with its financial obligations under the Franchise Agreements. (*Id.* ¶¶ 21-22.) Midas knew about Chesley's cash flow problems and allowed it to pay royalties to Midas over the course of every month. (*Id*. ¶ 25.) When Midas thereafter learned that Chesley intended to sell four of its Midas Shops to one of Midas's competitors, Monro, Midas terminated all ten Franchise Agreements. (*Id.* ¶¶ 23, 27.)

## II.     Allegations Regarding Chesley's Conversion and RPAPL Claims

Chesley was the tenant, and Midas the landlord, for a property located at 1942 Empire Boulevard, Webster, New York (the "Webster Property") and a property located at 795 East Ridge Road, Rochester, New York (the "East Ridge Property"). (*Id.* ¶¶ 32-33.) Chesley operated Midas Shops on the Webster and East Ridge Properties, including installing trade fixtures and signs and maintaining supplies there. (*Id*. ¶¶ 34-35.)

On January 16, 2012, Midas terminated the Franchise Agreements for the Midas franchises that Chesley operated at the Webster and East Ridge Properties. (*Id.* ¶¶ 4, 32-36.) Midas Properties sent ChesleyCo a notice on February 21, 2012, declaring that it had terminated the lease for the East Ridge Property, effective immediately, and that ChesleyCo had abandoned the premises. (*Id.* ¶ 37.) Similarly, on March 1, 2012, Midas Properties sent ChesleyCo a notice declaring that it had terminated the lease for the Webster Property and that ChesleyCo had abandoned the premises. (*Id.* ¶ 38.) On or about February 27, 2012, before Chesley could

4

remove all of its equipment, signs, and supplies from the East Ridge and Webster Properties, and without any notice or warning, Midas or its agents changed the locks to those properties, preventing Chesley from removing its equipment, signs, and lubricants. (*Id.* ¶ 39.) Midas knew that Chesley had not removed those materials from the properties. (*Id.* ¶ 40.) Chesley thereafter repeatedly requested Midas to allow it to remove its materials, but Midas has refused to respond. (*Id.* ¶ 41.)

## LEGAL STANDARD

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *AnchorBank*, 649 F.3d at 614 (internal quotation and citation omitted). Pursuant to Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)).

"In evaluating the sufficiency of the complaint, [courts] view it in the light most favorable to the plaintiff, taking as true all well-pleaded factual allegations and making all possible inferences from the allegations in the plaintiff's favor." *AnchorBank,* 649 F.3d at 614. "To survive a motion to dismiss, the complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face . . . . A claim has facial plausibility

when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Independent Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 934-35 (7th Cir. 2012) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (internal quotation marks omitted)). "The complaint 'must actually *suggest* that the plaintiff has a right to relief, by providing allegations that raise a right to relief above the speculative level.'" *Id.* at 935 (citing *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs.*, 536 F.3d 663, 668 (7th Cir. 2008) (emphasis in original)). "[A] plaintiff's claim need not be probable, only plausible: 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'" *Id.* (citing *Twombly*, 550 U.S. at 556 (internal quotation omitted)). "To meet this plausibility standard, the complaint must supply 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence' supporting the plaintiff's allegations." *Id.* (citing *Twombly*, 550 U.S. at 556). "The required level of factual specificity rises with the complexity of the claim." *McCauley v. City of Chicago*, 671 F.3d 611, 616-17 (7th Cir. 2011) (citing *Swanson v. Citibank, N.A.*, 614 F.3d 400, 405 (7th Cir. 2010)).

## ANALYSIS

**I.    Breach of Contract: Bad Faith Termination**

Midas contends that the arbitration clause in the Franchise Agreements precludes Chesley's bad faith termination claim. Specifically, Midas argues that Chesley's sole avenue for disputing the propriety of Midas's terminations of the Franchise Agreements was to submit an arbitration demand within ten days of receiving the termination notices. (R. 51, Midas Mem. of Law at 8.) Midas further contends that by not doing so, Chesley has waived its claims. For the

reasons explained below, the Court agrees that Chesley's sole avenue to challenge the propriety of Midas's terminations is arbitration, and therefore it cannot assert such a claim in this Court. The Court need not reach, and accordingly does not opine on, whether Chesley has waived its right to arbitrate its bad faith termination claim.

### A. Applicable Law

The parties largely fail to address what law the Court should apply in determining whether Chesley's bad faith termination claim falls within the arbitration clause in the Franchise Agreements. Accordingly, the Court explains the applicable law.

The Federal Arbitration Act (the "FAA") provides that "[a] written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Because the Franchise Agreements "involv[e] commerce," the FAA governs the issue of whether Chesley's bad faith termination claim falls within the arbitration clause in the Franchise Agreements.[1] *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983). The Supreme Court has repeatedly held that the FAA establishes "a liberal federal policy favoring arbitration agreements." *CompuCredit Corp. v. Greenwood*, 132 S. Ct. 665, 669, 181 L. Ed. 2d 586 (2012) (quoting *Moses H. Cone Mem'l*

---

[1] "The question whether the parties have submitted a particular dispute to arbitration, *i.e.*, the '*question of arbitrability*,' is 'an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise.'" *Howsam v. Dean Witter Reynolds, Inc.*, 123 S. Ct. 588, 154 L. Ed. 2d 491 (2002) (quoting *AT&T Techs., Inc. v. Comm'cns Workers*, 475 U.S. 643, 649, 106 S. Ct. 1415, 89 L. Ed. 2d 648 (1986) (emphasis added)). Neither party here argues that the arbitrator, rather than the Court, has the authority to determine whether the parties agreed to arbitrate Chesley's claim.

7

*Hosp.*, 460 U.S. at 24)). It also "requires courts to enforce agreements to arbitrate according to their terms." *Id.* (citing *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 221, 105 S. Ct. 1238, 84 L. Ed. 2d 158 (1985)).

To determine whether the parties agreed to arbitrate Chesley's claim, the Court applies state law regarding the formation of contracts. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S. Ct. 1920, 131 L. Ed. 2d 985 (1995) ("When deciding whether the parties agreed to arbitrate a certain matter," courts generally "should apply ordinary state-law principles that govern the formation of contracts."). The Franchise Agreements contain a choice of law provision providing that New York law applies to "all matters relating to the validity, construction, performance, and enforcement" of the agreements. (Franchise Agreement § 10.12 ("This agreement, including all matters relating to the validity, construction, performance, and enforcement thereof, shall be governed by the laws of the state in which the shop is located.").) Because all of Chesley's Midas Shops at issue in the parties' dispute are located in New York (Answer ¶ 17), the Court applies New York law.

Under New York law, "courts must interpret an arbitration provision to give effect to the parties' intent as expressed by the plain language of the provision." *John Hancock Life Ins. Co. v. Wilson*, 254 F.3d 48, 58 (2d Cir. 2001) (citing *PaineWebber, Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir. 1996), and *American Express Bank Ltd. v. Uniroyal*, 164 A.D.2d 275, 277, 562 N.Y.S.2d 613, 614 (N.Y. App. Div. 1990) ("Rather than rewrite an unambiguous agreement, a court should enforce the plain meaning of that agreement.") (citation omitted)). "Unlike most contracts, however, 'any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'" *Id.* (quoting *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24-25).

8

Specifically, when the parties' contract contains an arbitration clause,

> there is a presumption of arbitrability in the sense that [a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.

*Id.* (quoting *AT&T Techs.*, 475 U.S. at 650); *accord Kowalewski v. Samandarov*, 590 F. Supp. 2d 477, 489 (S.D.N.Y. 2008) (applying New York law).

New York courts have "long adhered to the 'sound rule in the construction of contracts, that where the language is clear, unequivocal and unambiguous, the contract is to be interpreted by its own language.'" *R/S Assocs. v. New York Job Dev. Auth.*, 98 N.Y.2d 29, 32, 744 N.Y.S.2d 358, 771 N.E.2d 240 (N.Y. 2002) (citation omitted). "[W]hen parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms." *Id.* Moreover, "[a] written contract will be read as a whole, and every part will be interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose." *Adams v. Suozzi*, 433 F.3d 220, 228 (2d Cir. 2005) (quoting *Westmoreland Coal Co. v. Entech, Inc.*, 100 N.Y.2d 352, 358, 763 N.Y.S.2d 525, 794 N.E.2d 667 (N.Y. 2003)).

### B. Chesley's Bad Faith Termination Claim Falls Within the Franchise Agreements' Arbitration Clause

The question before the Court is whether Chesley's bad faith termination claim falls within the scope of the arbitration clause in the Franchise Agreements. Applying the law discussed above, the Court concludes that it does.

The Franchise Agreements contain the following language:

(i) In the event that Midas gives to Franchisee any notice of default and/or notice of termination pursuant to paragraph (a), (b), (c), or (d) of this Section 8.2, and Franchisee disputes the right of Midas to terminate this Agreement pursuant to said notice or notices, then upon written demand

9

> made by Franchisee upon Midas at any time prior to or within ten days
> after notice of termination, such dispute shall be submitted to arbitration in
> accordance with the rules and procedures for commercial arbitration of the
> American Arbitration Association or any successor organization, and in
> accordance with and subject to all the provisions of the Uniform
> Arbitration Act as in force in the State of Illinois.[2] The place of arbitration
> shall be Chicago, Illinois.[3]

(R. 20-1, Franchise Agreement § 8.2(e)(i).)

Chesley contends that its claim does not fall within the scope of the Franchise Agreements' arbitration clause because it is "not limited to the terminations themselves," but rather "include[s] a course of conduct by Midas that ruined the financial value of Chesley's Midas's franchises and put Chesley in the position where he was vulnerable to termination." (R. 56, Chesley Opp. at 4.) Chesley's argument is unavailing, however, because its allegations directly challenge whether Midas had "just or proper cause" to terminate the Franchise Agreements, and they are also directly related to whether Midas had "the right" to terminate the Franchise Agreements. (Countercl. ¶ 20 ("Midas lacked just or proper cause for terminating any of the Chesley franchises."), ¶¶ 23, 27 (alleging that Midas improperly retaliated against Chesley in terminating the franchise agreements); ¶¶ 24-26, 28 (alleging that Midas was "not free to

---

[2] The Illinois Uniform Arbitration Act provides that "[a] written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable and irrevocable save upon such grounds as exist for the revocation of any contract[.]" 710 ILCS 5/1.

[3] The Franchise Agreements, which are substantially identical in form, are exhibits to Midas's Complaint, and Chesley incorporated them into his Counterclaims. (Countercl. ¶ 5.) Neither party disputes their authenticity, and they are central to Chesley's breach of contract counterclaim. Therefore, the Court may properly consider them. *See Continental Cas. Co. v. Am. Nat'l Ins. Co.*, 417 F.3d 727, 731 n.3 (7th Cir. 2005) (noting that it is proper for the court to consider an agreement containing the arbitration clause on a Rule 12(b)(6) motion where the agreement is central to the claim).

suddenly and unilaterally alter the parties' established course of performance," which altered the parties' original agreements"); Chesley Opp. at 4 ("Chesley seeks to prove that Midas' conduct leading to the terminations was the cause of the terminations.")). The sole legal authority on which Chesley relies in support of this argument, *Interim Health Care of N. Ill. v. Interim Health Care, Inc*., 225 F.3d 876, 885-86 (7th Cir. 2001), is not controlling here, given that the Court must apply New York–not Illinois–contract law. In any event, *Interim Health* would not save Chesley's claim because the franchisee in that case did not agree to submit its disputes regarding the right of the franchisor to terminate the franchise agreement to arbitration.

Chesley next argues that because the Franchise Agreements expressly provide that arbitrators shall not be allowed to assess or award damages, its claim–which seeks damages rather than reinstatement of the Franchise Agreement–does not fit within the arbitration clause. (Franchise Agreement § 8.2(e)(v) ("The arbitrators . . . shall in no event have any right or power to award or assess damages to or against any party.").) When considering that provision on its own, Chesley's argument appears to have some merit. But reading the Franchise Agreements as a whole, as the Court must do, however, *see Adams*, 433 F.3d at 228, Chesley's argument is misplaced.

Reading the Franchise Agreements as a whole demonstrates an agreed-upon dispute resolution process regarding the propriety of Midas's termination of the Franchise Agreements. First, under the Franchise Agreements, if Chesley disputes Midas's right to terminate the Franchise Agreement, it has to submit an arbitration demand within ten days of receiving the notice of termination. (Franchise Agreement § 8.2(e)(iii)). Second, the termination of the Franchise Agreements is suspended pending the arbitrator's decision (*id.* § 8.2(e)(vi)) regarding

11

Midas's right to terminate, thus allowing Chesley to continue operating the Midas Shops until the arbitrator resolves the dispute. If the arbitrator determines that Midas does not have the right to terminate the agreements, then Chesley continues operating the Midas Shops. If Chesley does not want to continue operating the Midas Shops, it can terminate the Franchise Agreements at will and therefore, contrary to Chesley's contention, it is not "stuck in a system in which it is not wanted." (*Id.* § 8.1 ("Franchisee may terminate this Agreement at any time, at the will of Franchisee and without cause. . . ."); Chesley Opp. at 7.) To the extent that Chesley seeks damages from the time period between Midas's termination and the arbitrator's determination that the termination was wrongful, Chesley may bring an action in court for a damages determination and award. In other words, the arbitrator determines liability, and the court determines damages. If, on the other hand, the arbitrator determines that Midas has the right to terminate the Franchise Agreements, then Chesley would not suffer any damages because the termination is not wrongful. As such, Chesley could not recover any damages. In either event, Chesley is not deprived of a right to seek damages for wrongful termination.

Moreover, there is no concern that Chesley will be precluded from attempting to recover damages for Midas's alleged conduct leading up to the terminations. Indeed, that conduct is the subject of Midas's other two breach of contract claims, based on Midas's "failure to supply competitive product pricing" and "lack of support." Midas has not moved to dismiss those claims, and they remain a part of this case. (Countercl. ¶¶ 7-19; Midas Mem. of Law at 4, n.2.)

Lastly, the Court easily rejects Chesley's argument that, if interpreted in the manner that

Midas advances, the Franchise Agreements are "unconscionable contracts of adhesion."[4] (Chesley Opp. at 7.) As the Second Circuit has held,

> [a]dhesion is found where the party seeking to enforce the contract used high pressure tactics or deceptive language in the contract and where there is inequality of bargaining power between the parties. In addition, it must be shown that the contract inflicts substantive unfairness on the weaker party.

*Milgrim v. Backroads, Inc.*, 91 Fed. App'x 702, 704 (2d Cir. June 21, 2002) (quoting *In re Ball (SFX Broadcasting Inc.)*, 236 A.D.2d 158, 160, 665 N.Y.S.2d 444, 446 (N.Y. App. Div. 1997) (citations omitted)). "Typical contracts of adhesion are standard-form contracts offered by large, economically powerful corporations to unrepresented, uneducated, and needy individuals on a take-it-or-leave-it basis, with no opportunity to change the contract's terms." *Klos v. Lotnicze*, 133 F.3d 164, 168 (2d Cir. 1997) (citation omitted).

Although Chesley argues that the parties had unequal bargaining power (Chesley Opp. at 7), "[i]nequality of bargaining power alone does not invalidate a contract as one of adhesion when the purchase can be made elsewhere." *Ranieri v. Bell Atl. Mobile*, 304 A.D.2d 353, 354, 759 N.Y.S.2d 448 (N.Y. App. Div. 2003); *see also Klos*, 133 F.3d at 169 (holding that the decedents' round-trip airplane tickets were not contracts of adhesion where the decedents were on notice of the disputed provision in the contracts and where they had other alternatives, such as traveling by boat or rail). Moreover, Chesley has not alleged that Midas used "high pressure tactics" or "deceptive language in the contract." *Milgrim*, 91 Fed. App'x at 704; *see also Klos*, 133 F.3d at 168-69 (holding that the concept of adhesion "may not be invoked to trump the clear language of the agreement unless there is a disturbing showing of unfairness, undue oppression,

---

[4] *See* 9 U.S.C. § 2 ("generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate [an] arbitration agreement").

or unconscionability") (citing, among other cases, *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 593, 111 S. Ct. 1522, 1527, 113 L. Ed. 2d 622 (1991)). Chesley's argument that the arbitration clauses in the Franchise Agreements are substantively unfair because the parties do not have a mutuality of remedy is undermined by the very legal authority on which Chesley relies throughout its motion. *Ball*, 236 A.D.2d at 161 ("mutuality of remedy is not required in an arbitration contract") (citing *Sablosky v. Gordon Co.*, 73 N.Y.2d 133, 137, 538 N.Y.S.2d 513, 535 N.E.2d 643 (N.Y. 1989)); *see also Doctor's Assocs., Inc. v. Distajo*, 66 F.3d 438, 451-53 (2d Cir. 1995) (recognizing that New York courts have rejected a mutuality of remedy requirement in the arbitration context). Moreover, although Chesley argues that the Franchise Agreements are substantively unfair because they deprive it of "complete relief," they do no such thing. Rather, as explained above, they set forth an agreed-upon dispute resolution mechanism. Accordingly, the Franchise Agreements are not unenforceable as contracts of adhesion.

### C. Chesley Is Precluded From Asserting Its Bad Faith Termination Claim In This Court

Midas further argues that by not submitting its dispute to arbitration within ten days of receiving the notices of termination, Chesley has waived his right to challenge the propriety of the terminations, and therefore his claim of "bad faith termination" must be dismissed. In support, Midas relies on the following provision of the Franchise Agreements:

> (vii) If Franchisee fails to serve proper written demand for arbitration as set forth in subparagraph (i) above within the time period specified in said paragraph, Franchisee shall be barred from seeking any relief, whether by way of arbitration or by way of action or defense in any court, with respect to any matter or issue which was subject to arbitration in accordance with this paragraph (e).

(Franchise Agreement § 8.2(e)(vii)).

This provision, when read in conjunction with Section 8.2(e)(i) of the Franchise Agreements, bars Chesley from challenging the propriety of Midas's right to terminate those Franchise Agreements in this Court.  Not only did Chesley agree to submit such claims to arbitration, as discussed above, it also agreed that it would be barred from "seeking any relief . . . with respect to any matter or issue which was subject to arbitration in accordance with paragraph (e)" if it did not submit those disputes to arbitration.  (*Id*. § 8.2(e)(vii).)

The Court acknowledges Midas's representations that Chesley initiated an arbitration proceeding on January 26, 2012, challenging the propriety of Midas's termination of four Franchise Agreements that Midas terminated on January 16, 2012.  Chesley has represented to the Court that it withdrew its demand for arbitration on March 27, 2012 "without prejudice."  (Chesley Opp. at 6.)  The Court expresses no opinion on whether Chesley has waived its right to contest the propriety of those or any other terminations in an arbitration, which is a matter for the arbitrator to decide.  *See Howsam*, 123 S. Ct. at 592 ("the presumption is that the arbitrator should decide 'allegation[s] of waiver, delay, or a like defense to arbitrability'") (citing cases and other authority).  For these reasons, the Court stays Chesley's bad faith termination claim.  *See Tice v. Am. Airlines, Inc*., 288 F.3d 313, 318 (7th Cir. 2002) ("district courts should retain jurisdiction over a suit that must be interrupted for reference of an issue to another forum rather than dismiss it if, should it be dismissed, there might later be grounds for reinstating it").

## II.  RPAPL

Chesley alleges that it is entitled to treble damages under Section 853 of the RPAPL because Midas evicted it from the East Ridge and Webster Properties "in a forcible and unlawful manner."  (Countercl. ¶ 46.)  Specifically, Chesley alleges that Midas changed the locks on those

15

properties on February 27, 2012 without giving any notice or warning to Chesley. (*Id.* ¶ 39.) Chesley further alleges that Midas's actions prevented Chesley from removing its equipment, signs and lubricants from the shops and that Midas knew that Chesley had not yet removed these materials when it changed the locks. (*Id.* ¶ 40.) Despite Chesley's repeated requests for Midas to allow removal of these materials from the properties, Midas has allegedly refused to respond. (*Id.* ¶ 41.)

Section 853 of the RPAPL provides as follows:

If a person is disseized, ejected, or put out of real property in a forcible or unlawful manner, or, after he has been put out, is held and kept out by force or by putting him in fear of personal violence or by unlawful means, he is entitled to recover treble damages in an action therefor against the wrong-doer.

RPAPL § 853. In short, Section 853 allows for the recovery of treble damages only if a person is ejected from real property "in a forcible or unlawful manner." (*Id.*)

Midas challenges Chesley's RPAPL claim on the grounds that its actions were neither forcible nor unlawful. (Midas Mem. at 9-10.) Midas contends that Chesley has not alleged any facts to support its assertion that Midas's conduct in changing the locks was "forcible." (*Id.* at 11.) Additionally, Midas argues that its conduct was not "unlawful" because Chesley had abandoned the properties at the time Midas changed the locks. (*Id.* at 10.) According to Midas, the leases governing Chesley's rental of the properties provided that Midas could terminate the leases in the event Chesley abandoned the premises.[1] (*Id.*)

---

[1] In its reply brief, Midas appears to raise an additional argument in support of its motion to dismiss—namely, that "Section 853 addresses forcible or unlawful entries and detainers—not claims of personal property conversion . . . ." (R. 63, Midas Reply at 9-10.) Because Midas did not raise this argument until its reply brief, it is waived. *See, e.g., Broaddus v. Shields*, 665 F.3d 846, 854 (7th Cir. 2011) (applying the "well-established" rule that "arguments raised for the first time in a reply brief are waived").

Action is "forcible" under Section 853 if one takes the premises by "actual force or personal violence, or a threat and menace to life and limb." *Jovana Spaghetti House Inc. v. Heritage Co. of Massena,* 189 A.D.2d 1041, 1042, 592 N.Y.S.2d 879 (N.Y. App. Div. 1993) (citations and internal quotation marks omitted). Chesley has not alleged that Midas's conduct in changing the locks and subsequently denying Chesley access to the properties was done through "actual force or personal violence" or a "threat and menace to life and limb." *Id.* That, however, does not end the inquiry because, under Section 853, treble damages may be available if a person is "disseized, ejected, or put out of real property in a forcible *or unlawful manner*." RPAPL § 853 (emphasis added).

In support of its argument that its conduct was not unlawful, Midas relies on its assertion that Chesley had abandoned the properties at the time Midas changed the locks. (Midas Mem. at 9-10.) Chesley, however, does not allege that it had abandoned the properties. Indeed, it alleges that its trade fixtures, signs, oils and lubricants were still on the premises at the time of the lockout. (Countercl. ¶ 42.) It further argues that special provisions in the leases govern whether Midas could deem the properties abandoned and that Midas could not have lawfully terminated the leases before March 27, 2012, which is the date on which Chesley withdrew its arbitration demand as to those properties. (Chesley Opp. at 12-13.)

Construing the allegations in favor of Chesley, as the Court must do on a Rule 12(b)(6) motion to dismiss, Chesley has adequately alleged that Midas's conduct was unlawful. The Court cannot determine whether Chesley had abandoned the properties as of the time Midas changed the locks–an issue of fact–on a motion to dismiss. *See Massare v. DiNardo*, 35 A.D.3d 1157, 1158, 830 N.Y.S.2d 395 (N.Y. App. Div. 2006) (holding that whether the plaintiff had

17

actual possession of the property at the time of the lockout was a question of fact); *Int'l Mktg., Ltd. v. Archer-Daniels-Midland Co., Inc.*, 192 F.3d 724, 730 (7th Cir. 1999) ("fact-finding has no part in resolving a Rule 12(b)(6) motion") (citing *Johnson v. Revenue Mgmt. Corp.*, 169 F.3d 1057, 1059 (7th Cir. 1999)). Chesley has met its burden to state a plausible claim for relief. *See AnchorBank*, 649 F.3d at 614 ("The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.") (internal quotation and citation omitted). Accordingly, the Court denies Midas's motion to dismiss Chesley's RPAPL Section 853 claim.

## CONCLUSION

For the reasons set forth above, the Court denies Midas's motion, but stays Chesley's bad faith contract termination counterclaim. Midas must file its answer with respect to the remaining counterclaims by July 9, 2012.

DATED: June 26, 2012　　　　　　　　　　　　　ENTERED

　　　　　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　　　　AMY J. STEVE
　　　　　　　　　　　　　　　　　　　　　　　　United States District Court Judge